[Crim. No. 578.   In Bank.—December 30, 1899.]

THE PEOPLE, Respondent, v. DORA FUHRIG, Appellant.

CRIMINAL·LAW—ABORTION—EVIDENCE—DYING DECLARATIONS—BELIEF
OF IMPENDING DEATH NOT SHOWN.—Dying declarations in reference
to the commission of the crime of abortion, leading to the death
of the declarant, are not admissible against a defendant charged
with the abortion, where the circumstances surrounding the
declarations, the condition of the declarant, and the testimony
of the attending physician render it doubtful whether the de-
clarant believed that the hand of death was laid upon her,
and her conduct in failing to make any preparations for death
seemed to indicate the contrary.   Dying declarations are not
admissible if the declarant had the slightest hope of recovery,
and if it is not plainly manifest that they were made under a
belief of impending death.

ID.—INTRODUCTION WRITTEN BY STENOGRAPHER WITHOUT REQUEST—RAT-
IFICATION NOT DISTINCTLY SHOWN.—An introductory statement de-
claring a knowledge of impending death, written by the sten-
ographer who took the evidence, without a previous statement
of such knowledge by the declarant, or a request that it be
written, is not shown to be distinctly ratified by a mere gen-
eral assent to a long document embodying the statement after
a single reading of it as a whole by the stenographer, and the
signing of it by the declarant, especially where the circum-
stances are such as to indicate that a belief of impending death
was not then manifestly in the mind of the declarant.

APPEAL from a judgment of the Superior Court of the City
and County of San Francisco and from an order denying a new
trial.   Carroll Cook, Judge.

The facts are stated in the opinion of the court.

Robert Ferral, for Appellant.

To sustain the admissibility of dying declarations there must
appear to be a settled, hopeless belief and expectation of im-
pending death.   (Rex v. Peel, 2 Fost. & F. 21; 6 Am. & Eng.
Ency. of Law, 105, 114, 115; People v. Hodgdon, 55 Cal. 72; 36
Am. Rep. 30; People v. Taylor, 59 Cal. 640; Regina v. Spilsbury,
7 Car. & P. 187; Errington's Case, 2 Lew. 148.)

Tirey L. Ford, Attorney General, and A. A. Moore, Jr.,
Deputy Attorney General, for Respondent.

The belief of impending death appears from the signed state-ment, but might be shown in any manner. (1 Greenleaf on Evi-dence, sec. 158; *People v. Sanchez,* 24 Cal. 17; *People v. Bem-merly,* 87 Cal. 118.) It was the province of the trial judge to determine the admissibility of the declarations. (1 Bishop's New Criminal Procedure, sec. 1212; *People v. Smith,* 104 N. Y. 498; 58 Am. Rep. 547; *Kehoe v. Commonwealth,* 85 Pa. St. 127; *People v. Glenn,* 10 Cal. 32; Greenleaf on Evidence, sec. 160.)

GAROUTTE, J.—Defendant, having been convicted of the crime of abortion, appeals from the judgment and order deny-ing her motion for a new trial.

The most important testimony in the case bearing upon de-fendant's guilt consists of a so-called dying declaration of the deceased. The conclusion the court has arrived at as to the ad-missibility of this declaration demands a new trial of the defend-ant. This declaration was in writing and signed by the de-ceased. It began as follows:

"Knowing I am about to die, I hereby make this my last statement and declare same to be the truth and the whole truth, so help me God." This statement was made in the following manner, as disclosed by the testimony of O. H. Heynemann. He testifies as follows:

"My name is Otto H. Heynemann; am stenographer to the chief of police of this city; held that position all of December last; still hold that position; have seen Dr. Perry; accompanied Detective Cody to the house of Mrs. Walmsley, at 418 Laguna street, in this city; got there between 10 and 11 o'clock in the morning; saw Mrs. Walmsley, the deceased, there; recognize that document; outside of the signatures the handwriting in it is mine; the statement therein, except the formal part—the first line—was made by the deceased, Mrs. Walmsley; Detective Cody, Dr. Perry, a lady, and myself were present; Mrs. Walms-ley was in bed, sick; prior to making her statement Dr. Perry told her that she would probably die, and to make a statement and tell the truth; noticed her appearance." He further testi-fied that at this time "she looked to be very emaciated. She seemed to be in a very weak state. She made this state-ment immediately after the doctor told her she would proba-bly die." The witness continued: "I wrote down the statement

she made immediately after the doctor told her she would prob-
ably die; the language she used commences on page 2; she used
none of the language on page 1; the balance of the statement
contains her language; her language begins with 'My name is';
I read the whole of the statement to her, including the first
page—the entire statement to its close, and before she signed
it she said that it was all right; and she signed it; she said it
was all right; afterward Dr. Perry, Mr. Cody, and myself signed
it; from the second page to the close of the statement contain
the exact words she used; she appeared to be mentally all right."
The language which the witness says the deceased did not use,
but which he inserted in the statement, is the language which
we have heretofore quoted from the statement. The cause of
the woman's death was peritonitis, and she died the day suc-
ceeding the time of the making of the statement. The fore-
going evidence in substance contains everything tending to
show the condition of the woman's mind at the time she made
the statement.

We find the following definition of dying declarations in
the American and English Encyclopedia of Law, volume 6,
page 105: "Dying declarations are statements of material facts
concerning the cause and circumstances of homicide, made by
the victim under the solemn belief of impending death, the
effect of which on the mind is regarded as equivalent to the
sanctity of an oath." In the case of *People v. Hodgdon*, 55 Cal.
72, this court said: "Dying declarations are not admissible in
evidence if the declarant had the slightest hope of recovery,
although he dies within an hour afterward." Indeed, there is
no controversy here as to the law. The difficulty arises when a
given state of facts is tested in the measure furnished by the
law. Yet, in this case, there is no serious difficulty in making
the test. We have found no case in the text-books or decisions
of courts where hearsay statements have been admitted before
the jury under the guise of dying declarations upon evidence so
meager as that disclosed in this record. Let us pause a moment
to look at the facts, at the same time bearing in mind that the
all-important question is, Did this woman at the time she made
this statement firmly believe that her death was then impend-
ing? In other words, did she believe at the time that she was

about to die? We lay aside as unimportant the facts that she was emaciated and in a weak state. Hardly to the slightest degree do these circumstances tend to prove the issue. They might be quite material in some cases, but we do not appreciate their importance here. Neither do we attach any weight to the statement of the doctor to her that she "would probably die." The usual and ordinary effect of such a statement by a doctor to a patient would be to infuse in his mind a hope, a possibility at least, of recovery. Such a statement would naturally indicate that the doctor himself still had some hopes of the patient's recovery. Laying this statement aside, we then have nothing left save the declaration found in the written statement as follows: "Knowing I am about to die I hereby make this last statement, and declare." This excerpt from the writing must form the foundation upon which to rest the admissibility of the dying declaration or a foundation is lacking. Yet the difficulty at once presents itself that this statement was a declaration made by the stenographer, and not by the woman. The condition of the mind when a purported dying declaration is made may be determined by the acts or the language of the party. These acts and this language may unite in tending to show one condition of mind, or they may each point to a different condition of mind, and when they are inconsistent the conduct of the patient may indubitably overthrow any conclusion based upon his language, and the reverse may be equally true. So it is not in every case of a statement by the patient that he believes himself about to die that a sufficient foundation for the admission of his declarations is created. But, as suggested, we have not even that here. A statement consisting of one hundred and eighty-four words is read to this dying woman without break or interruption. At the conclusion of the reading she stated it was all right and signed it. It therefore results from the foregoing that the entire basis for the admission of these declarations rests upon a ratification by the unfortunate woman of the stenographer's statement to the effect that she knew that she was about to die. And this ratification of the statement is found in a general assent to the correctness of the entire contents of quite a long written document. To sustain the people in their contention upon this point would be going

beyond sound legal principles.  If the particular statement of
the stenographer had been separately and directly called to the
attention of the woman, and she had understandingly and un-
conditionally declared such statement to be the truth, the ques-
tion here presented would be different.  Certainly, a much
stronger showing would then be made.  But we have no such
case, and the showing made is entirely too weak.

We are more fully impressed with the soundness of this con-
clusion when we find the physician who had paid her several
professional visits, and who was present when the purported
dying statement was made, in answer to the question put by
the district attorney, "Could you tell, Doctor, from her state-
ment [referring to the statement here under consideration] and
manner, whether or not Mrs. Walmsley appeared to appreciate
the fact that she was in a dying condition?" saying: "Not posi-
tively, I could not."  If the attending physician, who knew all
about the woman's condition, who had told her that she would
probably die, who was in possession of all the evidence that was
before the reporter when he made the statement, and which was
before the court upon this trial, and who was present when the
statement was made, was unable to make a positive declaration
that the woman thought she was about to die, then surely her
belief of impending death was not plainly manifest.  In addi-
tion to all this she made no preparation whatever for death,
gave no direction  as to her effects, offered no suggestion as to a
final parting with her friends and relatives, said nothing and
did nothing to indicate that the hand of death was laid upon
her.  Yet, all this time she was fully conscious, her mind was
clear, she could talk and use her hands.

The trial court justified its ruling in admitting this state-
ment as a dying declaration upon the authority of *People v.
Bemmerly,* 87 Cal. 117, but upon  a  careful consideration of
that case, the court finds nothing  there furnishing author-
ity for the ruling here made.  In that case it is said: "*Aliunde*
the written declaration there is sufficient evidence that it was
made under a sense of  impending death."  Again it is said:
"Whether the statement alone would be sufficient to sat-
isfy the rule that the declaration must be made under a sense
of impending death need not be decided in this case, as there

was other evidence that it was so made." We also find a broad chasm dividing the two cases in their facts in this: In the Bemmerly case the party writing the dying declaration of the wounded man placed nothing therein except what had been in substance stated to him. In the case at bar, the writer of the declaration bodily placed declarations of matters therein which had never even been suggested by the unfortunate woman. Again, in the Bemmerly case the statement after being written was read to the wounded man a single sentence at a time, and then indorsed by him as true, sentence by sentence. Thus every separate sentence was brought directly home to his mind. In the case at bar the statement was read to the woman in bulk, and only indorsed by her in the same way. From what has been said the great difference in the facts of the two cases is readily perceptible.

For the foregoing reasons the judgment and order are reversed and the cause remanded for a new trial.

Temple, J., McFarland, J., Harrison, J., Van Dyke, J., Henshaw, J., and Beatty, C. J., concurred.